NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF THE VIRGIN ISLANDS
ST. CROIX DIVISION

JENNIFER A. LOVE and STEVEN
HAUPERT,

        Plaintiffs,

v.

NELSON VELASQUEZ aka NELSON
MORALES and DANIEL NERIS aka
DANIEL HERNANDEZ,

        Defendants.

Civ. No. 12-95

OPINION

THOMPSON, U.S.D.J.[1]

## INTRODUCTION

This matter is before the Court upon the remaining question of damages following the award of default judgment to Plaintiffs (ECF Nos. 49, 50). Defendants have failed to appear in this action. The Court has decided this matter upon consideration of the written submission (*see* ECF No. 57) and after a hearing on damages held on January 3, 2018. For the reasons set forth below, the Court grants Plaintiffs' Motion.

## BACKGROUND

The parties are familiar with the procedural history and background of this case and therefore only a brief overview is necessary. This is a tort action for damages arising out of an automobile accident. Plaintiffs Jennifer A. Love ("Love") and Steven (or Stephen) Haupert ("Haupert") are both citizens and residents of St. Croix. Defendant Nelson Velázquez a/k/a Nelson Morales a/k/a Nelson Morales-Velázquez ("Velázquez") is a citizen and resident of

---

[1] The Hon. Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

1

Puerto Rico, and at the time of the accident was driving an Avis Rent a Car vehicle, rented by Defendant Daniel Neris a/k/a Daniel Hernandez a/k/a Daniel A. Hernandez-Neris ("Neris"), who is also a citizen and resident of Puerto Rico.

## I. The Accident

On July 16, 2012, Haupert was driving Love's car, with Love in the passenger seat, headed west on East End Road on St. Croix in the vicinity of Miss Bea Road. Haupert and Love were both wearing their seatbelts. Haupert noticed a car approaching, driving on the wrong side of the road, and pulled over onto the shoulder to try to avoid a collision. The approaching car was driven by Velázquez and had been rented by Neris. Velázquez and Neris, along with at least one other passenger, were in the vehicle. Velázquez was driving at a high enough speed that, upon head-on impact, his car became airborne and landed on top of Love's car.

Haupert suffered severe injuries because the driver's side of the car bore the brunt of the force from the accident. Upon impact, Haupert's wrist was thrust into the air conditioning vent. His face smashed into the steering wheel, and his lower teeth pushed through his bottom lip. He crawled onto the passenger seat and out of the passenger side window, when he fell to the ground because his legs were badly injured and could not support him. As Haupert testified, he then realized "everything was broken." He did not feel a great amount of pain in that moment, but recalls being in shock. After the accident, Love observed the occupants of Velázquez's car tossing Heineken bottles into the brush on the side of the road. Love testified that these individuals seemed limber and fine after the accident.

Coincidentally, Dr. Deborah Appleyard,[2] the on-call emergency room doctor on the day of the accident, was driving on East End Road and came upon the accident scene shortly after the

---

[2] Dr. Appleyard received her M.D. from the Perelman School of Medicine at the University of Pennsylvania and completed her orthopaedic surgery residency at Brown University. She also

2

accident occurred. When she pulled over and exited her car, she saw Haupert lying on the pavement, conscious but injured. She assisted the paramedics on the scene and then proceeded to the Emergency Room to await Haupert's arrival by ambulance.

## II.   Treatment & Recovery

Haupert was transported to the hospital, where Dr. Appleyard treated him. Dr. Appleyard testified to Haupert's injuries and the actions taken to treat them over the course of his three-week hospital stay and thereafter. In addition to disfiguring facial injuries, Haupert suffered injuries to all four of his extremities. He sustained fractures of the left tibia, right foot, left radius, right wrist, and left femur. On July 17, 2012, the day after the accident, Haupert underwent closed reduction repair of all four extremities in four operations. On July 23, 2012, Haupert had open reduction surgery on the left wrist, with installation of a metal plate for stabilization of the repair. That same day, his right wrist was placed in a cast and his left leg was splinted. The following day, July 24th, Haupert had a metal rod and plates surgically installed in his left tibia to repair the fractured tibia. On July 31, 2012, Haupert had another surgery, an open reduction and fixation of the left femur. Throughout his three weeks in the hospital, Haupert was taking morphine for pain; Love remained in the hospital during this time. On November 20, 2012, four months post-accident, Haupert's left wrist had healed sufficiently to remove the hardware.

In the first three months following the accident, Haupert was immobile and wheelchair bound. Prior to the accident, he and Love lived together on their sailboat. Once Haupert was released from the hospital, they moved into a friend's first floor apartment because it was impossible for Haupert to get on or off of the boat. In those three months, Haupert was dependent on Love for every aspect of his life—from feeding, bathing, and dressing to helping

---

completed fellowships at Brown and the University of North Carolina. She then served as an attending surgeon for three and a half years in the Virgin Islands.

3

him use the bathroom and cleaning him afterwards, which he found humiliating. Love provided 24/7 care to Haupert. Haupert required substantial physical therapy. At first, the physical therapist would visit him two or three times per week. He worked on going up and down steps and range of motion exercises, which were painful. The physical therapy continued for about four months.

The month before the accident, the couple had used Haupert's life savings to purchase a marine supply store and boat repair facility. This joint business venture was to be their sole source of income. Following the accident, they could no longer manage the store or perform boat repairs. This created financial worry and forced them to hire help that they would not otherwise have retained. For the first three months after the accident, an employee, Lisa, was scheduled to work seven days per week, eight hours per day, at $10/hour, and five days per week thereafter while Haupert recovered. The cost of this additional help amounted to at least $10,000.

After three months, when Haupert's casts had been removed and he was no longer confined to a wheel chair, the friend's apartment was no longer available. The couple moved into an office above the store because they still could not live on the boat and could not afford their own apartment. This allowed Love to work in the store more and to decrease Lisa's hours, but the business still could not perform boat repairs because that depended on Haupert's skills. In order to live in the upstairs space, Haupert had to have special crutches fitted for him.

It took about a year for Haupert to recuperate. The broken toes on his right foot caused him the most pain and took two years to fully heal. More than five years after the accident, Haupert continues to have a screw in his knee, a rod in his left leg, and a screw above his ankle. He remains unable to squat. While the hardware from his hand has been removed, he still has limited range of motion in his hand. He testified that, prior to the accident, he was a skilled guitar player and had produced two CDs of his music. Now, he can barely play the guitar because his

4

fingers are so immobile. Haupert has scarring on his left wrist, right wrist, left knee, left ankle, and face, and he also has an indentation on his shin bone where the bone broke. He has grown a beard and mustache to hide the scarring on his face. He used to jog almost every day but can no longer do so because the impact on his left leg is too severe. He can no longer support himself to do push-ups. He loved to dance before the accident, but cannot dance the way he used to. At 52 years old, he feels like an old man.

Dr. Appleyard testified that Haupert still likely faces additional surgery to remove some of the hardware in his left leg. Moreover, she testified to a reasonable degree of medical certainty that Haupert would encounter early onset of degenerative arthritis in his extremities because of the trauma he sustained. Dr. Appleyard also testified that the multiple fractures in Haupert's right foot are likely to lead to future pain, and there are concerns about future conditions, such as the potential need for a knee replacement as he ages.

Love sustained a minor injury to her right foot in the accident. She was also transported to the hospital, where her foot was X-rayed and treated. However, she suffered the emotional distress of caring for her life partner throughout his recovery and the financial strain the accident imposed on the couple. She testified that "it was hell," the hardest thing she'd done, and that at first she cried every night. She also testified that she is no longer a good passenger in cars due to her anxiety from the accident. Furthermore, Love testified that the relationship will continue to feel effects of the accident in the future, as Haupert is not able to do things that make him happy, like playing the guitar, running, and dancing.

Plaintiffs concede that because their store was so new, it would be too speculative to try to project an economic loss from the new venture; nevertheless, $10,000 in otherwise unnecessary labor costs for Lisa's wages is directly attributable to the accident, and Haupert's injuries undoubtedly set the business back. As a result of the accident, Haupert incurred

5

$137,744.31 in medical bills. Most of his medical costs were covered by insurance, but Haupert had to pay a total of $24,829.00 out of his own pocket. Love did not have health insurance and paid her total medical costs of $1,130.42.

### III. Procedural History

Plaintiffs filed their Complaint on September 12, 2012, alleging gross negligence on the part of Defendant Velázquez and negligent entrustment by Defendant Neris. (ECF No. 1; *see also* Am. Compl., ECF No. 43.) Defendants were properly served but have never appeared in this action. The Clerk of Court entered default on January 24, 2014. (ECF No. 24.) Plaintiffs filed their motion for default judgment on February 10, 2016. (ECF No. 44.) This case was reassigned to Judge Anne E. Thompson on May 8, 2017. (ECF No. 46.) After a hearing on June 9, 2017 (ECF No. 48), on June 15, 2017 this Court entered default judgment on liability in favor of Plaintiffs (ECF Nos. 49, 50). The Court directed Plaintiffs to submit documentation supporting their claims for damages and to contact the Court to schedule further proceedings regarding Plaintiffs' damages. (Order, ECF No. 50.)

A hearing on damages was originally scheduled for September 20, 2017. Plaintiffs submitted documentation to support their claimed damages, which the Court received on September 14, 2017. Due to difficulties caused by Hurricanes Irma and Maria, the hearing was rescheduled for January 3, 2018. At the hearing, Dr. Appleyard and both Plaintiffs testified. Plaintiffs' counsel conducted direct examination, and the Court also examined the witnesses. The Court found the witnesses credible and directed Plaintiffs' counsel to submit proposed findings of fact and conclusions of law, which Plaintiffs timely filed on January 31, 2018 (ECF No. 57). The Court now adopts the proposed findings of fact and conclusions of law, as modified herein.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55(b)(2), a court may enter default judgment when a party has failed to plead or otherwise defend the action. Default judgment is a sanction of last resort, and the decision is left to the sound discretion of the trial court. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). The Third Circuit disfavors default judgment, preferring for cases to be adjudicated on their merits. *Id.* at 1181. In considering a motion for default judgment, the district court must accept as true all well-pled factual allegations, but not any legal conclusions or alleged damages. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990). Courts may conduct hearings to "determine the amount of damages," "establish the truth of any allegation by evidence" or "investigate any other matter." Fed. R. Civ. P. 55(b)(2). Courts may reserve final judgment on the issue of damages until counsel is fully heard. *See, e.g., Mendez v. Puerto Rican Int'l Cos., Inc.*, 2015 WL 4575221, at *1 (D.V.I. July 29, 2015) ("Plaintiffs prevailing by default are 'not automatically entitled to the damages they originally demanded[.]'"); *JPMorgan Chase Bank, N.A. v. Candor Const. Grp., Inc.*, 2010 WL 1490830, at *4 (D.N.J. Apr. 13, 2010). Final judgment may be entered where damages are for a sum certain, Fed. R. Civ. P. 55(b)(1), or where sufficient proofs are offered for the court to determine a specific sum. "Plaintiff must ... offer some proof of damages." *Malik v. Hannah*, 661 F. Supp. 2d 485, 490 (D.N.J. 2009) (citing Fed. R. Civ. P. 55(b)(1)–(2); *Comdyne*, 908 F.2d at 1149); *see also Pirate Bay Charters, LLC v. Vachon*, 2017 WL 4287196, at *1 (D.V.I. Sept. 27, 2017).

## ANALYSIS

In tort cases, such as this one, "[w]hen a person has suffered physical harm that is more or less permanent in nature ... he is entitled to recover damages not only for harm already suffered, but also for *that which probably will result in the future.*" *Corriette v. Morales*, 50 V.I. 202, 211 (2008) (per curiam) (quoting Restatement (Second) of Torts § 912 cmt. e (1979))

(emphasis in original). To support claims of compensatory damages for harm to one's body, feelings, or reputation, the plaintiff must present evidence of the nature of the harm, and the finder of fact can determine the amount of recovery on that basis, using the standard of "such an amount as a reasonable person would estimate as fair compensation." *Id.* at 212.

In addition to offering the testimony of both Plaintiffs as fact witnesses and Dr. Appleyard for her expert medical opinion, Plaintiffs have submitted extensive medical records about the post-accident treatment they received. (*See* Pls.' Exs. 1–8, ECF Nos. 57-1–57-8.) The testimony and medical records establish that, as a result of the accident, Haupert incurred $24,829.00 in unreimbursed medical expenses and Love incurred $1,130.42 in unreimbursed medical expenses.[3] These awards are appropriately documented compensatory damages, and the Court hereby approves them. Plaintiffs also seek $10,000 for Mr. Haupert to compensate him for the costs of hiring someone to work in his business when he was unable to do so. (Pls.' Br. at 8, ECF No. 57.) The Court likewise finds this amount to be adequately documented compensation for costs which resulted from the Defendants' tortious conduct.

The question remaining for the Court is the appropriate amount of damages for pain and suffering, mental anguish, and loss of the enjoyment of life. Awards in other cases for individuals who suffered similar injuries, treatments, and recoveries provide useful insight and guidance in fashioning an appropriate award here. *See, e.g., Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir. 1987). Damages for pain and suffering and mental anguish are self-explanatory—designed to compensate for the physical, psychological, and emotional toll of injury. "The component relating to loss of enjoyment of life in some respects duplicates the

---

[3] Although a defendant in a tort case bears the burden to invoke the collateral source rule, in this case, where the Court has imposed judgment by default, the Court exercises its discretion to award only the out-of-pocket medical expenses rather than the total medical expenses. This decision is further supported by the important principle that plaintiffs mitigate their damages.

8

component of pain and suffering, but also represents a deprivation of the opportunity to participate in normal social, athletic, or recreational activities in which a person without . . . injury could engage." *Id.* at 774.

Plaintiffs seek $1.3 million in damages for Haupert and $30,000 for Love for pain and suffering, mental anguish, and loss of the enjoyment of life. Plaintiffs acknowledge that the cases they cite are inapposite, but attempt to illustrate that courts have awarded substantial recoveries even where the plaintiffs suffered far less severe injuries than those suffered by Plaintiff Haupert. *See, e.g., Simpson v. Betteroads Asphalt Corp.*, 2013 WL 5276563, at *13 (D.V.I. Sept. 18, 2013) (awarding $325,000 in pain and suffering to plaintiff who suffered from non-paralytic back injury requiring surgery, and who testified to weakness and inability to get out of bed on some days), *aff'd*, 598 F. App'x 68 (3d Cir. 2015); *Henry v. Hess Oil V.I. Corp.*, 163 F.R.D. 237, 240–41, 249 (D.V.I. 1995) (awarding $200,000 in pain and suffering to plaintiff who fractured right tibia and fibula requiring full leg cast, was never hospitalized, did not undergo surgery, incurred $20,000 in medical expenses, and healed after two years); *Brown v. McBro Planning & Dev. Co.*, 660 F. Supp. 1333, 1339–40 (D.V.I. 1987) (approving award of $200,000 to plaintiff, and $25,000 for his wife, after suffering knee injury requiring four weeks in a soft cast, who underwent arthroscopic surgery a few years after the accident to repair torn meniscus, had medical costs paid by insurance, lost ten days of work, could no longer engage in pastimes with his family like hiking and dancing, could not help wife carry laundry or groceries or move furniture, and developed traumatic arthritis).

The Court has also considered more apposite cases—cases in which individuals lost time at work from substantial injuries requiring surgeries and significant rehabilitation that nevertheless did not result in permanent disability. *See, e.g., Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1231 (3d Cir. 1989) (upholding award of $429,000 for pain and suffering where

plaintiff with herniated disc was unable to perform her pre-injury employment and suffered from permanent pain which rendered her irritable with family and inhibited her ability to do housework, read, sleep, and maintain a sexual relationship with her husband); *Rivera v. V.I. Hous. Auth.*, 854 F.2d 24, 27–28 (3d Cir. 1988) (upholding verdict of $250,000 for pain and suffering for plaintiff who sustained a herniated disc with neurological involvement, suffered continuous pain, and was unable to engage in practically any activity); *Brum v. Extreme Builders, Inc.*, 2010 WL 2400158, at *5–6 (D.N.J. June 10, 2010) (awarding default judgment of $750,000 for past and future pain and suffering where 26-year-old plaintiff severely injured his neck, ribs, back, and legs; underwent two weeks of hospitalization and three months of inpatient post-injury rehabilitation; was wheelchair bound for three months; developed injury-related bladder issues and impotence; had not recovered full mobility; could no longer drive a car, walk normally, or play sports; and could not resume his pre-injury employment); *Warner v. Lawrence*, 754 F. Supp. 449, 457 (D.V.I. 1991) (approving award of $278,000 where plaintiff suffered from back injuries, including herniated intervertebral discs; lost considerable time from work; could benefit from surgery; faced permanent back pain as well as degenerative and disabling future effects; could no longer play basketball or engage in other recreational activities he used to enjoy, and could no longer do heavy lifting, the sort of work he used to do); *see also* 13 A.L.R. 4th 212 §§ 20(a)–21(e), 27(a)–(e) (1982) (collecting cases on injuries to legs, feet, and toes reflecting similar monetary awards).

In this case, Plaintiff Haupert, a now 52-year-old man, underwent multiple surgeries for injuries to all four extremities; spent three weeks in the hospital; incurred upwards of $130,000 in medical bills; experienced intense pain for many months; was wheelchair bound for three months; had to move out of his home and find temporary housing; felt humiliated by his total dependence on Love during his initial recovery; could not work for many months; faces

10

continuing complications, including early onset of arthritis and a potential knee replacement down the line; and has lost the ability to engage in some of his favorite pastimes, including playing the guitar and running. The accident disrupted his new business venture, thereby causing not only financial stress but also personal cost due to the strain on his relationship with Love. In view of this evidence and the case comparisons detailed above, the Court finds an award of $725,000 for pain and suffering, mental anguish, and loss of the enjoyment of life is appropriate.

Turning to Plaintiff Love, she admittedly suffered from a minor foot injury but likewise experienced significant financial and personal costs as the sole caretaker for her recuperating life partner for three months. Love's testimony also reflects her own anxiety from the accident, mental anguish from her caretaking role, and loss of enjoyment due to the effects on her relationship with Haupert. All told, the Court finds Love's request for $30,000 in pain and suffering, mental anguish, and loss of the enjoyment of life to be reasonable.

Finally, the Court notes that Virgin Islands law caps non-economic damages for any injury to a person in an action arising out of a motor vehicle accident, such that they may not exceed $100,000 except in cases of gross negligence or willful conduct. 22 V.I.C. § 555(a). The Court has already found Defendant Velázquez grossly negligent by way of default judgment, and thus he will be liable to each plaintiff for the full amount of the judgment. With respect to Defendant Neris, there is no evidence of gross negligence or willful conduct. Therefore, the non-economic damages awarded against him for Haupert's injuries will be capped at $100,000.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment on damages is granted. An appropriate order will follow.

Date: Feb. 26, 2018

ANNE E. THOMPSON, U.S.D.J.

11